### FUNDY *vs.* THE STATE OF GEORGIA.

1. The opinion of a spectator, expressed just before the commencement of a fight, that one of the parties had a malicious intent towards the other, is not legal evidence that such an intent existed.

Murder, in Gwinnett Superior Court.    Tried before Judge HUTCHINS, November, 1859.

The plaintiff in error, John Fundy, was indicted for the murder of Hardin Colson, and pleaded not guilty.

The following is a brief of the evidence introduced on the trial:

#### *Testimony for The State.*

John Dunbar was present at the fight; deceased was in the room, together with some others, about to take a drink, and defendant came in and deceased asked defendant to drink with him; defendant made a short reply and refused, and then remarked to witness, he never was so insulted in his life, and witness asked him why? (the parties were about fifteen feet apart, defendant near the counter, and deceased near the door of the partition—they were in the back room,) defendant replied, that man asked him to drink with him, and he never was so insulted in his life; deceased remarked, if he was insulted at that to help himself; defendant replied that he could, and turned and advanced toward deceased; defendant at that time run his right hand in his left bosom and cursed deceased; called him a damned puppy; said he had stolen a dollar from him; deceased replied, but witness does not know what; the fight then commenced; they came together, and deceased struck defendant some three or four licks with something; defendant kept advancing toward deceased until the fight commenced; deceased did not go toward defendant up to that time; they clinched and fell on the floor; witness could not tell who was on top or how they were fighting; one or the other hallooed two or three times, but witness could not tell which; some person run up then and parted them; after they were parted, deceased went right out of the room; defendant then came up to the counter and handed witness the knife, a bowie-knife about seven

inches long, (which is the same now shown), and told witness to lay it away, as he, defendant, could whip him, deceased, a fair fight; that he, defendant, was not hurt, but he guessed somebody else was, and defendant then went out at the door; witness afterwards saw some blood about midway of the blade of the knife, but did not examine it when it was first handed to him, and it had not been out of his possession until he discovered it; this all occurred on the 3d of October last, in this county; witness saw deceased soon after the fight, and saw but one wound on him; that was on his left side; did not examine for any other; saw Drs. Russell and Freeman there; there were perhaps about one dozen persons in the room when the fight took place—Mr. Bennifield, Allen, two O'Shields, and Mr. Rutledge; these are all now recollected; witness was behind the counter in the same room; as defendant turned from the counter he run his hand in his bosom; cannot say any one besides the parties took any part in the fight; did not see the knife until handed to him; it was then out of the scabbard; does not think deceased a very violent man; never saw deceased have but one fight besides this one.

*Cross-examined:* Had heard of deceased having some fusses; does not know of deceased having the character of a violent man; witness did not come from behind the counter; the persons were stirring about the room, the reason he could not see them any better; did not swear on the first trial that deceased struck him with a stick; when they fell on the floor it was toward the back door some five or six feet from it; the hallooing during the fight by one of the parties, was to take him off; the stick witness found on the floor was about the size of the one shown, perhaps not so large; all the blows witness saw was struck near the partition door, and they scuffled towards where they fell; when deceased was striking he appeared to be striking at defendant's head, and the blows seemed to be heavy; and the stick found was large enough for witness to kill a man with, if he struck him in certain places.

Dr. W. J. Russell testified, he was called upon on the 3d night of October to see deceased, and found him in Ambrose's grocery, and found him on the floor with five wounds, one in the left side between the 8th and 9th ribs, two on the arm above the elbow, two on the back, the

one on the left side about four inches long and six inches deep, and about two inches directly and through the diaphragm, touching the lungs, the left lobe, as it passed; the wounds on the arm were small; the two on the back, one went to the hollow, and a little wider than the knife shown; thinks they were made with a knife; the one in the side appeared to be. cut a little across; attend him; the wounds were inflicted on Monday evening, and he died the Thursday following; is satisfied he died of the wounds; thinks death ensued from the one in his side.

*Cross-examined:* But one wound, in his opinion, mortal; first went two inches through the ribs, and four inches between the ribs, and then turned down through the diaphragm about four inches; he thinks that the parties were on their feet at the time, but could be done just as well if they were down, and deceased on top of the prisoner; deceased was frequently in difficulties, and a very stout man.

*For Prosecution:* Thinks the wound could be inflicted with the knife shown, and the point is turned as if it had struck something; defendant is not so stout looking as deceased; deceased was a man of great physical power.

Dr. Jesse Lowe saw deceased in Ambrose's grocery on Monday night of the election, and described the wounds nearly as Dr. Russell; deceased lived about four days; thinks the one in the side proved mortal, and the knife shown is long enough to make the wounds; was inclined to believe the wound was given in an inclined position; has no doubt but the wound was the cause of his death.

*Cross-examined:* Thinks the wound failed to heal, and the loss of blood and the effusion and cutting the diapragm was, he thinks, the cause of his death; he was removed to Mr. Garret's the next day; the wound or incission in the diaphragm was from four to six inches; cannot account for the wound being wider in the diaphragm; lying down would perhaps have a tendency to increase the rupture; saw deceased that day in a quarrel; cannot say he was a violent man; he was a man of fine physical developments.

*For State:* It would be almost a miracle for one to recover with such a wound.

*Dr. Russell reintroduced by Prosecution:* The cut could have been made standing or lying; the wound could have been made larger in than out; he died from inflammation;

Fundy *vs.* The State of Georgia.

he was carried carefully on a cot; he was kept propped up as much as possible.

John O'Shields was present at the difficulty; it was at Sterling's grocery; deceased called out liquor, and asked defendant to have some, and he replied short and refused, and deceased started out and stopped at the door; was in the back room, and had, in going out, got to the middle door and stopped, and deceased took a stick from witness which was about one inch or so thick; about that time defendant told Dunbar that he had never been so insulted in his life, and Dunbar asked why, and he said by as damned a rascal as Colson asking him to drink with him; deceased and defendant was about ten or twelve feet apart; deceased said, in substance, listen at that damned rascal, and oughtn't I to frail him with a stick, and replied to defendant, if he was insulted to help himself, and defendant then approached deceased and said, you are a damned puppy, and have stolen a dollar from me; defendant had his right hand under the left breast of his coat at the time; deceased gave back a step or two against a barrel and raised his stick and said, don't draw a pistol, and defendant advanced to within a step or two of deceased; deceased then struck defendant two or three times with the stick, and defendant backed while deceased was striking until they got near the counter; deceased then dropped the stick and they clinched and tusseled and fell on the floor, and witness then saw the knife going a time or two, and deceased got hold of defendant's wrist of the hand in which the knife was held; at that time defendant was on his back on the floor, and deceased was nearly on him, but not quite; deceased had, when witness parted them, his knee on defendant's left arm, and was holding the wrist of his right hand in which was held the knife, and witness slung deceased back, and he, deceased, went out at the door, and witness saw him no more till at W. Ambrose's; thinks the knife shown is about such a knife as defendant had when parted, and when striking with it he was striking deceased rather on the left side and back, most likely on the back; Ambrose's and Sterling's groceries are almost joining, and witness saw deceased in Ambrose's grocery sitting holding his side and bleeding very freely; it is in this county; was about 8 o'clock at night on the first Monday in October last; it was about two or three minutes

after deceased left, witness found him in Ambrose's grocery; saw but one wound on deceased at the time; that was on the left side, about three or four inches wide; deceased's coat identified; did not see his wounds dressed; deceased died at Garrett's; when deceased backed against the barrel, he rather creaned back; deceased, in the opinion of witness, was not a violent man, but would run against a man pretty strong if he had advantage of him.

*Cross-examined:* Deceased asked defendant if he would not take something, and defendant refused; at the time defendant made the remark to Dunbar about being so insulted, defendant had his back towards deceased; thinks deceased did not say damn you; does not recollect swearing so on the other trial, but if he did, deceased said so; thinks deceased raised the stick after he stepped back; defendant got near deceased before he stopped, and about that time deceased struck; if witness swore on the first trial that he had stopped before deceased struck him, it was so; some eight or ten feet from where they stopped and clinched to the back door; they fell very quick after clinching; witness was in the door and scared and looking on; defendant had his right hand under the breast of his coat when deceased first struck, and knocked off a lick or two with his left hand; deceased was drinking a little; deceased was a man who would take up a fight very quick, but does not know that he was in the habit of getting up quarrels; thinks deceased was much of a man; heard some one (thinks deceased) say take him off, or part us; thinks there were eight or ten persons in the room when the fight began, and some of them run out; witness and deceased were friendly at the time.

*Rebuttal:* The chimney is near the counter, and the door is nearer the counter than the chimney.

Simeon O'Shields was present at the fight, and saw it; defendant came into the grocery piazza where witness and deceased were standing, on the side of the house, and stood at the door, and then came towards witness and deceased; deceased and Robert Bennifield was throwing crack-loo, and defendant staggered up against deceased, and witness said he was the best man in the house; witness stepped out on the ground; defendant acted like a drunken man; defendant then came to witness and asked him to take a drink, and caught witness by the arm, and walked up to the bar and

called out some liquor ; defendant walked as straight as other men ; think neither witness nor defendant very drunk at that time ; this occurred but a short time before the fight—from five to fifteen minutes ; after we went in, witness heard the throwing of crack-loo going on, and heard deceased talking until deceased came in the room ; witness left no one out there but deceased and Bennifield ; after the staggering, witness and defendant were standing in the door ; witness put his foot upon the foot of deceased ; deceased looked round, and witness told deceased if he did not mind, he, deceased, and defendant would have a bad difficulty, and deceased replied, he asked defendant no odds, if he would come at him right ; this was a minute or two after staggering against them ; about the time liquor was set out for defendant, deceased came in and called out a pint of ginger brandy, and deceased and others drank out of the pint cup, and deceased passed it to witness, and he drank ; deceased then asked defendant to drink, and defendant refused ; deceased asked defendant to drink in about the same manner he did witness and others, which was in a friendly manner ; after drinking, deceased and some others started out, met some one at the partition door and stopped ; defendant then said to Dunbar, he had not been as badly insulted in six or twelve months ; said remark was made in a common voice, and was loud enough for deceased to hear it ; deceased then turned around and said, if that had insulted him he could insult him worse ; defendant replied, you are a damned puppy, and deceased replied, you are a damned liar ; defendant replied, you are the very damned rascal that stole my dollar ; defendant was standing leaning with his elbow on the counter, resting his head on his hand, and about that time deceased turned around and took a stick from some one ; defendant raised up and turned around, and about that time deceased took hold of the stick ; as defendant turned around he put his right hand in his left bosom, and walked up towards deceased, and come in about two or three steps of deceased ; deceased stepped back a step or so against a barrel, and said, don't draw a pistol on me, and the next witness saw they were fighting ; could not tell which struck first ; witness had jumped upon the counter, and it seemed as if both struck about the same time ; heard blows, and heard a stick fall, and defendant fell near the counter ; whether he fell or deceased threw him,

does not know; deceased caught him by the wrist of the right hand, in which was the knife, and put his knee upon the same arm, and held him; about that time John O'Shields run up and caught deceased and threw him off, and thinks that defendant struck at deceased with the knife as he was thrown off; that was all the lick he saw after they fell; the knife shown is like the one witness saw defendant have; heard some one halloo, knife; after separated, deceased caught his side and belly and ran out; witness then ran out after the deceased; he next saw defendant a prisoner; nothing to obstruct view of witness from a full view of the fight.

*Cross-examination:* There was, it appeared, three or four persons, or more, in the room at the time; witness was sober; it was a short or quick fight, perhaps not more than one minute; the parties fell close to the back door; no one between the counter and the parties while fighing, as recollected; saw them all the time, but cannot tell who gave back; the parties were but a very little distance from the middle door when they clinched and scuffled or tusseled to where they fell; the parties may have been upon the floor a short time; witness had been in the room with defendant a short time, perhaps five minutes; cannot say the precise words used by deceased when he asked defendant to drink; knows nothing of the character of deceased as a bully; saw deceased striking, but did not see the stick; saw both parties striking; both struck about the same time; witness cannot tell how many drinks he had taken that evening, but thinks he was not disguised with liquor; the reason why witness told deceased to mind, or him and defendant would have a bad difficulty, was that he had seen them have a difficulty previous; the difficulty was in September last; thinks in that difficulty deceased picked up an old pistol and said he had a great mind to knock him down with it; that difficulty was on account of the parties gambling, and defendant cursed deceased and said he had stole a dollar; witness and his brother prevented deceased from striking defendant with the pistol; heard deceased make no other threat in reference to defendant; was about knocking him down.

*Rebuttal:* The light appeared dim in the part of the house where the parties were fighting; does not know whether the pistol was capable of shooting or not; thinks the butt of the

knife shown is the same defendant had in his bosom at the September fuss.

James Allen saw a portion of the difficulty; deceased struck defendant with his fist, and defendant was using his knife, was the first I saw; they were then on their feet, and near the middle of the counter, not very far from the middle of the floor; defendant appeared to be striking deceased on the left side with a knife; appeared to be a pocket-dirk, about five or six inches long in the blade; as deceased was in the act of throwing defendant, he, deceased, said, boys, see me a fair fight, and defendant struck him, and deceased threw defendant on the floor and then jumped and went out of the room; defendant then got up and handed his knife to John Dunbar, and said, by God, if he wanted a fair fight, he could give it to him, and defendant then went out; as they fell, deceased sorter fell over defendant, and then ran off; saw defendant strike some two or three licks; saw deceased strike with nothing but his fist.

*Cross-examined:* There were several persons in the room; saw deceased strike but one lick, and that was with his fist; there was but one candle, and a dim light at that, as witness recollects; deceased fell rather over defendant; did not hold him down; defendant was not flat on his back on the floor; rather on one hip and elbow, as well as recollected; witness was not drunk, but drinking some; was not in Lawrenceville on the next day, or day thereafter; told Matthew Crawford that he saw deceased strike defendant three licks with a stick; has no recollection of being in Lawrenceville since the difficulty until last Monday.

Nimrod Miller saw a difficulty between deceased and defendant last September Court, one night, in an old house; defendant accused deceased of taking a dollar from him; deceased denied it; defendant said he be damned if he didn't, and deceased said he be damned if he did; defendant replied, you are a damned liar; they both rose and deceased commenced pulling off his coat, and defendant run his hand in his side-pocket, and one of the O'Shields caught deceased, and witness caught defendant and carried him out of the room, and witness went back in the room and the door was shut, and deceased reconciled; defendant called witness out and asked him if there was any chance to get to whip that damned rascal, he had stolen a dollar from him, and that he would kill him, or have satisfaction for his dollar.

*Cross-examined:* Did not hear deceased say he would kill defendant if he made the charge again; afterwards, witness told deceased he had better watch defendant, and deceased replied, he did fear the damned rascal; if he ever made a pass at him he had better make a sure one; did not tell defendant anything about deceased getting into difficulties; he, deceased, was a man that would not take anything from any body; deceased was not a man of difficulty; the pistol in the room was not loaded, and the barrel about two and a half inches long.

John Gauge, on the night of the 3d October last, met defendant on the street, opposite Ambrose's grocery.

*Cross-examined:* Knew deceased.

Joseph H. Gauge saw defendant on the night of the difficulty.

*Cross-examined:* Knew deceased:

Martha Williams never heard defendant make any threats about deceased, except, that if he ever pestered him he would whip him.

*Cross-examined:* Ellen McDaniel lives at the house of Adaline Hunt; lewd women live there.

Ellen McDaniel heard defendant say, on Monday night of last Court, that if ever Hard Colston crossed his path he intended to cut his God damned daylights out, and patted his breast and said he had something in there to do it with.

*Cross-examined:* Lives at Adaline Hunt's; been there two or three months; lived A. Liddle's previous to that; the conversation testified to, was in the house, in the early part of the ........; defendant stayed about two hours; Roach came off with defendant when he left; it is about one mile to Hunt's; deceased was there at the time the threat was made, but was not in the house; never heard deceased say anything about defendant.

Hiram J. Cox got the knife shown from John Dunbar; it was bloody and battered.

*Cross-examined:* Could not consider the house of Adaline Hunt's a whore-house; Ellen McDaniel is considered a perfect prostitute.

P. A. Sterling knew deceased; he was not considered a violent, overbearing man, but would not be run over.

*Cross-examined:* Does not know of him being an over-

bearing man; Adaline Hunt's house is considered a brothel; Ellen McDaniel is a prostitute.

Hiram J. Cox, reintroduced; Knew deceased; thinks he was a coward, instead of a violent man.

James D. Spence knew deceased; does not think him a violent man.

*Cross-examined:* Believed that he would be a dangerous man when aroused; Adaline Hunt's house bore the reputation of a whore-house; Ellen McDaniel has the reputation of a whore.

Zebulon B. Craig has known deceased since 1853; would allow himself trampled upon, but when pushed upon he would defend himself; did not consider him a violent man.

*Cross-examined:* I have taken no part in this prosecution except in one thing; deceased or any man is worse when drunk than sober.

Asa McMillen arrested defendant on the night of the affray, between Dr. Lewis' doctor-shop and the blacksmith-shop; he was going towards the shop.

Here the State closed.

Defendant introduced no evidence.

Counsel for defendant objected to the testimony of O'-Shields, "that from five to fifteen minutes before the fight, prisoner staggered up against witness and deceased, who were standing together, and swore that he was the best man in the house," and to the testimony of the same witness, "that immediately after the above occurrence, witness told deceased to be on his guard; if he did not, deceased would have a bad difficulty with prisoner." The objection to this testimony, was upon the grounds that there was no connection between the occurrence first testified to and the fight, and that the latter was merely the opinion of the witness. The Court overruled the objection and the testimony went to the jury, and counsel for defendant excepted.

The evidence being closed, the Court commenced its charge to the jury, as follows:

"You have been long detained in this investigation, and must be fatigued. I shall, therefore, as briefly as I can, explain the law to you, and then it will remain for you to render such a verdict as the law and evidence warrant. Before doing so, let me remind you that in considering the case, you are to let none of the common passions of our nature influence

you; no prejudice or partiality should be permitted to enter into your deliberations; as men, we might, on the one hand, weep over the sad fate that sent a young man, with his mangled body, to the grave, where it now moulders—and we might, on the other hand, weep over the condition of the prisoner at the bar, and over the sorrows and distresses of a good old man whose gray hairs may be brought with sorrow to the grave, as others have been, by an unfortunate son. But as jurors, you are to indulge in none of these feelings. You have taken an oath to find your verdict according to the evidence, and to that, and nothing else, you ought to look for your guide in making up your verdict."

Counsel for defendant complained of this charge, as calculated to impress too strongly the minds of the jury against the prisoner, and excepted thereto.

The Court further charged the jury, that "if they believed that it was prisoner's intention to provoke a difficulty with deceased, to induce him to make an assault upon prisoner, and deceased did make an assault thus provoked by prisoner, with a design to use this as a pretext to inflict his vengeance upon him and killed him, it was murder; or if prisoner was approaching deceased with a deadly weapon, with intent to kill or wound him, and deceased struck him in self-defense, and used only such force as was necessary for his defense, and the prisoner killed him, in pursuance of his original intention, it is murder."

The Court further charged, that "witness cannot be impeached by proof that she is a prostitute; her want of chastity may and ought to exclude her from good society, but it does not, in law, impeach her veracity as a witness, or exclude her testimony."

The Court further charged, that "the law does not impute perjury to any witness, unless he or she is contradicted or impeached, and the jury must look to the whole evidence. If the witnesses disagree or contradict each other, the jury are to judge between them and determine according to their opinion as to the truth of the evidence."

To all of which charges the counsel for prisoner excepted.

The jury returned a verdict of guilty: whereupon, counsel for prisoner moved for a new trial, on the grounds of error in the rulings and charge of the Court above stated

Fundy *vs.* The State of Georgia.

and excepted to; and on other grounds not given, because not necessary to illustrate the decision of the Court.

The Court refused the motion for a new trial on each and all the grounds therein taken, and counsel for prisoner excepts, and assign said refusal as error.

CLARK & LAMAR; J. N. GLENN; GORDON, for plaintiff in error.

Solicitor-General THURMAND, *contra.*

*By the Court.*—STEPHENS, J., delivering the opinion.

The whole theory of murder in this case rested upon the fact that the prisoner had an intent to kill the deceased *before* the fight commenced. The opinion of O'Shields, therefore, that he had such an intent, was very *material* evidence. It tended to hurt the prisoner, because it bore directly upon the point to be established against him. It was not legal evidence, not because such an intention was an improper fact to be proven, but because the mere opinion of a witness, expressed, not on the stand under oath, but reported by him on the stand under oath, as having been expressed just before the fight commenced, was an improper means of proving it. The attempt was made in the argument to bring this evidence within the principle of *res gestœ*, but it cannot be brought within that principle. The opinions which spectators may happen to form concerning an affair, cannot be considered as part and parcel of the affair; and whether they keep their opinions to themselves or express them to others, can make no difference, unless the expression may have influenced the course which the affair took. In such a case, the expression of the opinion would be part and parcel of the affair itself. If, for instance, the deceased in this case had been the slayer instead of the slain, he might have proved that this opinion had been expressed to him just before the fight, by way of showing that he acted on a warning of danger, and not from malice. In that case, the opinion would not be any evidence that the fact had been in accordance with it, but the expression of the opinion would itself be a fact, exerting an influence upon the transaction. But in this case, the opinion went as evidence that the fact had been in

accordance with it; that is to say, as evidence that the prisoner did have the intent to kill before the fight commenced. The expression of that opinion to the deceased could have had no influence upon the prisoner, and there is no more reason for allowing the witness to testify that he had expressed such an opinion to the deceased, than there would be for allowing him to testify that he had *thought* so, without expressing it. In other words, the expressed opinions of spectators, except when they may be fairly supposed to have exerted an influence upon the affair, and no more part and parcel of it than their secret thoughts would be. We find no other error in this record.

Judgment reversed.